JOHN J. SUNDHEIM AND JANICE A. SUNDHEIM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sundheim v. Commissioner
Docket No. 3146-80.
United States Tax Court
T.C. Memo 1982-417; 1982 Tax Ct. Memo LEXIS 327; 44 T.C.M. (CCH) 568; T.C.M. (RIA) 82417; July 26, 1982. Gloria T. Svanas, for the petitioners. Mark H. Howard, for the respondent. *329 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: This case was assigned to and heard by Special Trial Judge John J. Pajak pursuant to the provisions of section 7456(c) of the Internal Revenue Code of 1954, [1] and Rule 180. [2] The Court agrees with and adopts the Special Trial Judge's Opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax under sections 6651(a) and 6653(a) as follows: Additions to Tax
Year
Deficiencies in Tax
Section 6651(a)
Section 6653(a)
1975
$142.70
$31.14
$34.60
1976
14,517.66
725.88
1977
43,644.25
2,182.21
*330 The issues for decision are: (1) whether the petitioners or a so-called family trust are taxable upon certain income; (2) whether petitioners are liable for the additions to tax under sections 6651(a) and 6653(a); (3) whether petitioners should have reported $28,068.00 of income not otherwise reported in either their individual income tax return for 1977 or the return of the family trust for 1977; and (4) whether petitioners have met their burden of proving that respondent's other determinations are incorrect. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition in this case was filed, petitioners resided in Englewood, Colorado. Petitioners filed joint income tax returns for the taxable years 1975 through 1977. In 1974, petitioners purchased materials from Educational Scientific Publishers (ESP) to establish the JOHN J. SUNDHEIM FAMILY ESTATE (A TRUST) (hereinafter referred to as the Trust). [3] On May 13, 1974, John J. Sundheim (John) executed, as grantor, a preprinted ESP form entitled "DECLARATION OF TRUST OF THIS PURE TRUST" establishing *331 the Trust. The purpose of the Trust was set forth as follows: THE DECLARED PURPOSE OF THE TRUSTEES OF THIS TRUST shall be to accept rights, title and interest in real and personal properties conveyed by THE CREATOR HEREOF AND GRANTOR HERETO. Included therein is the exclusive use of his lifetime services and ALL OF his EARNED REMUNERATION ACCRUING THEREFROM, from any current source whatsoever, so that John J. Sundheim (Grantor-Creator's Name) can maximize his lifetime efforts through the utilization of his Constitutional Rights; for the protection of his family in the pursuit of his happiness through his desire to promote the general welfare, all of which John J. Sundheim (Grantor-Creator's Name) feels he will achieve because they are sustained by his RELIGIOUS BELIEFS. In May 1974, by purported transfers from petitioner Janice A. Sundheim (Janice) to John and then by purported transfers from John to the Trust certain property and the exclusive *332 use of petitioners' lifetime services and all remuneration earned thereform were allegedly conveyed to the Trust. Included in the properties purportedly transferred were petitioners' personal residence and non-income producing property, such as household appliances, furniture, and seven sets of skis. John was the Executive Trustee and Janice was the Executive Secretary of the Trust. Darrel D. Backus, a representative of ESP, was named as a Trustee merely to set up the Trust. John testified that his twenty-year-old son, John M., and his eighteen-year-old daughter, Diane, became Trustees upon formation of the Trust. Petitioners' son Gregory was made a Trustee on December 26, 1976, after he had reached eighteen years of age. It is clear that petitioners during the taxable years retained full control over the assets of the Trust and were the signators of the Trust bank account. The preprinted ESP Trust document states that the beneficial interests in the Trust were divided into 100 units in "certificate form hereto attached." All certificates during the years in question were in the names of petitioners or in the names of Janice and their three children, John M., Diane, and *333 Gregory. The certificates state that the benefits conveyed consisted solely of the "emoluments" distributed by the Trustees. John listed his occupation as an entrepreneur on the joint individual income tax returns for the years in issue. He was also an inventor. Janice was a secretary for various organizations during the years in issue. Janice reported her earnings on the individual income tax returns for 1975, apparently for 1976, [4] and for 1977. In 1975, John received $5,700.00 in consulting fees from the Trust and reported this amount as income on his 1975 return and paid self-employment tax thereon. John testified that in 1970 he formed Windsor Industries, Inc. (Windsor). In 1973, he sold his then remaining interest in Windsor to the other shareholder for $40,000.00. Windsor was in the business of manufacturing and selling carpet cleaning equipment. John was employed by Windsor as an inventor. In an Amendment *334 to Employment Contract with Windsor, effective January 1, 1974, John's compensation was reduced and his duties were changed from "executive duties" to that of a consultant to Windsor in the fields of product and market development. In a May 13, 1974, letter to Thomas M. Francis, Windsor's president, relative to his employment contracts with Windsor, John stated that his "sole desire in assigning and conveying my interest in these contracts [to the Trust] is to conserve my assets and better my tax structure." In an affidavit dated May 14, 1974, purportedly transferring his lifetime services to the Trust, John stated that his earned remuneration was form services to Windsor. During the taxable years, John engaged in the research and development of inventions. Once the Trust was formed, he purportedly did so on behalf of the Trust. By January 1, 1975, John had developed an idea for a carpet cleaning device and eventually he made one named the "Zinger." About November 1, 1975, John, purportedly on behalf of the Trust, entered into a joint venture with Ronald Strange (and his company, Tools for Bending, Inc.) whereby Strange would put up money, credit and engineering to help produce *335 the Zinger. From November 1, 1975, through December 15, 1976, the joint venture operated under the name International Maintenance Products. One of Stange's employees did the bookkeeping for the venture. By the fall of 1976, Stange's support was waning and John borrowed $35,000.00 from his father-in-law, Ralph Borchert. [5] Because substantial funds were required to put the Zinger into commercial production, John sought financial support from various sources. Ultimately, he decided to license the Zinger to Windsor. Accordingly, in what we term the Windsor transaction, a number of interrelated documents were executed in 1977 by Windsor, the Trust, and John as an individual. Windsor's attorneys, obviously questioning the validity of the Trust, required that John sign the documents in his individual capacity. Since we view the Trust as a nullity, to reflect what we believe actually occurred, we will generally refer only to Windsor and John, recognizing that the Trust was interposed *336 in each of the documents along with John as if it were a viable entity for income tax purposes. The Asset Purchase Agreement provides that Windsor "desires to purchase certain assets and properties used in Sellers' business of manufacturing and distributing Zingers and floor cleaning tools" for a stated price of $68,000.00. The Zinger was defined as "the carpet cleaner products manufactured by Sellers, consisting of a tankage unit and a floor tool." In this transaction, John sold tools, molds, patterns inventory, accounts receivable, trademarks, and other capital assets to Windsor. tWindsor and John executed a Consulting Agreement in 1977. Albeit in form the Trust was named as the consultant, in substance the consultant was John. The Consulting Agreement states that the "services provided for herein shall be performed exclusively by Consultant's [the Trust] employee Sundheim [John]." The consulting income was clearly derived from the personal services of John. The Consulting Agreement further provides that certain patentable inventions and improvements made or conceived by John, at the option of the Trust "shall remain the property of Sundheim [John], subject, however, *337 to the terms and conditions of the License Agreement [executed the same date by the Trust and John, as licensors, and Windsor, as licensee]." Consulting fees were paid under the contract to the Trust. The Consulting Agreement also contains a noncompetition clause which we find relates solely to John as an individual. John was paid $22,000.00 in 1977 as partial consideration for the covenant not to compete. Under the License Agreement, Windsor was to pay the licensees royalties for the exclusive license for the manufacture, use and sale of certain products embodying or incorporating certain inventions, i.e., the Zinger. The Trust reported these royalties on its returns. As part of the Windsor transaction, Windsor paid $70,000.00 in two checks to John and John endorsed them to Tools for Bending, Inc. This apparently was the payment to Strange or his companies for the investments in the Zinger. The $70,000.00 was not reported as part of the gain on the sale by the Trust. By a Promissory Note (Note #1) dated January 1, 1977, John borrowed $50,000.00 from Windsor. John also gave Windsor a $40,000.00 note, Promissory Note #2, dated March 1, 1977. To clear up claims for purposes *338 of the Windsor transaction, effective January 1, 1977, John paid Ralph Borchert $38,500.00 in repayment of aggregate loans, using the Trust bank account. John testified that both promissory notes given to Windsor were part of the Windsor transaction. Petitioners introduced no evidence to show that the management and use of real and personal property purportedly conveyed to the Trust changed after the conveyance. Petitioners also failed to show any change in the way that John conducted his business of inventing, research, and development. John made great efforts to obtain working models for his patents. His services generated most of the Trust income during the years in issue. Petitioners used the Trust to pay their personal expenses, such as maintenance and real estate taxes on their personal residence. Despite the alleged transfer of petitioners' property, including their home and personal household goods, petitioners continued to live in their home and the use of these personal items remained unchanged. Petitioners deducted many of their personal expenses on the fiduciary income tax returns of the Trust for the years in issue. During 1977, petitioners received $28,068.00 *339 of taxable income which they failed to report and which was not reported by the Trust. That income included $508.00 in interest income from Columbia Savings and Loan Company, and the following amounts from Windsor: $22,000.00 for the covenant not to compete; $4,000.00 in consultant fees; and $1,560.00 in royalty income not previously reported. [6]
In the notice of deficiency respondent disregarded the Trust and made adjustments in order to tax petitioners as if it had not been created. Respondent attributed to petitioners income earned by them and improperly reported by the Trust in the amounts of $12,100.00, $42,412.83, and $62,650.76 for the years 1975, 1976, and 1977, respectively. Respondent reduced income in 1975 by the $5,700.00 reported as consulting fees received from the Trust. Respondent determined that in 1977, John realized a long term capital gain of $12,655.00 and ordinary income of $25,601.19 from the sale of assets to Windsor. The ordinary *340 income was included in the $62,650.76 figure mentioned in the preceding paragraph.After various capital gain adjustments, respondent increased petitioners' taxable income in 1977 by $5,858.48. Respondent also increased petitioners' 1977 taxable income by the $28,068.00 which had not been reported by either the Trust or petitioners. Respondent disallowed automobile depreciation deductions taken on the individual returns in the amounts of $175.00, $175.00, and $975.00 for 1975, 1976, and 1977, respectively. Respondent also determined that the income from the sale of tools in 1975 was ordinary income and increased taxable income by $1,000.00. Respondent increased the standard deduction in 1976, allowed the proper number of exemptions and the maximum personal exemption credit in each of the three years, allowed $333.00 and $333.00 in investment credits for 1975 and 1976, respectively, increased tax for 1977 by $666.00 as a result of recomputing prior year investment credit, adjusted self-employment tax to $92.00, $1,209.00, and $1,304.00 for 1975, 1976, and 1977, respectively, and imposed the additions to tax under sections 6651(a) and 6653(a) in the amounts set forth above. Respondent *341 also gave petitioners the benefit of income averaging for 1976 and 1977.
OPINION Petitioners are confused about their burden of proof. They contend in their brief that respondent did not meet "his burden of proof," referring to section 482. [7]Petitioners failed to show that they came within any of the exceptions to the general rule set forth in Rule 142(a). [8] Thus, it is petitioners who have the burden of proving that respondent's determinations are wrong. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The petitioners adherence to and careful reliance on form does not avoid the substance of this Court's consistent rulings that ESP trusts do not shelter taxpayers from taxation. [9] We again sustain respondent's *342 determinations for the reasons set forth below. Petitioners ostensibly assigned their lifetime services and all of their earned remuneration to the Trust. Yet, both petitioners disregarded their assignments and the Trust. In at least two of the three years in issue Janice did not turn over her earnings as a secretary to the Trust but reported them on petitioners' individual income tax returns. John accepted payment of consulting fees from the Trust in 1975. It would have been ridiculous to have the Trust pay such fees to him if the assignment had been valid because the fees would have had to have been returned immediately *343 to the Trust.See Ferguson v. Commissioner,T.C. Memo. 1982-251. When asked at trial whether the consulting fee should have been assigned back to the Trust, John responded: "Well I -- I think you're just taking that -- point a little too far. You still have to eat and have money." Petitioners used their ESP family Trust to avoid taxation by having the Trust pay for personal, living and family expenses which are nondeductible under section 262. Our review of the record compels us to conclude that the Trust lacked economic substance and was a nullity for Federal income tax purposes. Markosian v. Commissioner,73 T.C. 1235 (1980). In addition, this ESP family Trust scheme is an anticipatory assignment of income, and, as we have repeatedly held, does not shelter petitioners from taxation on their income, regardless of the effect of the assignments under State law. See, e.g. Vnuk v. Commissioner,T.C. Memo. 1979-164, affd. 621 F.2d 1318 (8th Cir. 1980); and Horvat v. Commissioner,T.C. Memo. 1977-104, affd. *344 582 F.2d 1282 (7th Cir. 1978). Lastly, John as a grantor of an ESP family Trust is unable to escape taxation because of the grantor trust provisions of sections 671 though 677. Vercio v. Commissioner,73 T.C. 1246 (1980); and Wesenberg v. Commissioner,69 T.C. 1005 (1978). Petitioners claim that their children, as Trustees and as holders of units of beneficial interest, constitute adverse parties for purposes of sections 671 thrugh 677. For the reasons set forth in Borchert v. Commissioner,T.C. Memo. 1982-379, we find that petitioners' children were not adverse parties.[10]
In their petition, petitioners do not deny that $28,068.00 of income was not reported *345 in 1977 but merely claim that the income was properly reportable by the Trust. Under our rulings above, the income is attributable to them. Moreover, petitioners offered no explanation why $28,068.00 of income in 1977 was not reported on the returns filed either by the Trust they were using as a tax shelter or by themselves. Petitioners obviously have failed to prove that the items of income comprising the $28,068.00 amount were not earned by them in 1977 and respondent's determinations must be sustained. Welch v. Helvering,supra;Rule 142(a). There was some testimony by John to the effect that he was entitled to deductions for expenses of maintaining a home office. We do not have to reach the question of whether petitioners satisfied the stringent requirements of section 280A, which neither party briefed, because there is no way we can ascertain from this record what expenses were attributable to John's business as compared to the personal uses of his family. On brief, petitioners apparently assert the $70,000.00 debt paid at the time of the Windsor transaction represented properly deductible expenses of the Trust. Yet John admitted that the expenditures *346 listed on the documents prepared by an employee of one of Stange's companies were not necessarily paid by the Trust. In John's own words: "Well, some were and -- some of them weren't." It appears that the $70,000.00 was a repayment of expenses incurred by Stange and/or his companies. In any event, on this record, there is no way to determine whether any expenses in excess of those allowed by respondent were proper deductions by petitioners. Petitioners have failed to meet their burden of proof. Welch v. Helvering,supra;Rule 142(a). Since respondent did not charge petitioners with $70,000.00 of income as a result of discharged indebtness under section 61 and section 1.1001-2, Income Tax Regs., we will not do so. Instead, in view of petitioners' total failure to meet their burden of proving that any of respondent's determinations were wrong, we sustain those determinations. [11]Welch v. Helvering,supra;Rule 142(a). *347 Petitioners offered no reason why their 1975 return was not timely filed. Accordingly, the section 6651(a) addition to tax for failure to timely file their 1975 return is sustained. Rule 142(a). We are not required to believe unsupported self-serving statements made by a petitioner without evaluating them in light of all facts and circumstances in the record. Anderson v. Commissioner,55 T.C. 756, 758 (1971). John was not a credible witness. On this record, we are convinced that the primary, if not sole, purpose of the petitioners was to disregard the tax laws in their attempt to avoid application of the law to them. Petitioners' alleged reliance on a Certified Public Accountant is not persuasive, particularly since we had the opportunity to consider the credibility of that accountant at trial. [12] John's masquerade as a Trust did not hide the fact that he earned most of the income reported by the Trust. *348 The five per cent addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations in the family trust cases in situations similar to the one before us has been upheld by this Court in virtually every case. Wesenberg v. Commissioner,supra. See cases cited in Borchert v. Commissioner,supra. We consider the five per cent addition to tax a modest penalty to impose on someone engaged in a "flagrant tax avoidance scheme." Wesenberg v. Commissioner,supra at 1015. We agree that the additions to tax under section 6653(a) should be imposed in this case. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect during the taxable years, unless otherwise indicated. All references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
2. Pursuant to the order of the Chief Judge, on the authority of the "otherwise provided" language of Rule 182, the post-trial procedures set forth in that rule are not applicable in this case.↩
3. The Trust was also known as the John J. Sundheim Family Equity Trust which was the name used by the Internal Revenue Service when it assigned an "Employer identification number" to the Trust.↩
4. No Forms W-2 were attached to the copy of the 1976 return submitted as an exhibit by the parties. The amount shown as wages, salaries, tips and other employee compensation for 1976 is more than that shown for 1975 and less than that shown for 1977.↩
5. Ralph Borchert created his own ESP family trust to avoid taxation. We have found that this trust was ineffective for tax purposes. Borchert v. Commissioner,T.C. Memo. 1982-379↩.
6. Although the notice of deficiency incorrectly characterized the $1,560.00 as "Rental income," respondent correctly termed it royalty income in his brief and petitioners did not object to this recharacterization.↩
7. Since respondent did not rely on section 482 in this case, we will not mention it further other than to observe that section 482 does not shift the burden of proof to respondent. ↩
8. See Gibson v. Commissioner,T.C. Memo 1982-374↩.
9. See Antonelli v. Commissioner,T.C. Memo. 1980-544; Basham v. Commissioner,T.C. Memo. 1980-545; and Dombrowski v. Commissioner,T.C. Memo. 1980-261. We are aware of over fifty decisions of this Court and the Courts of Appeals which have reached this result. See e.g., Vnuk v. Commissioner,621 F.2d 1318 (8th Cir. 1980), affirming T.C. Memo. 1979-164; and Gran v. Commissioner,664 F.2d 199 (8th Cir. 1981), affirming T.C. Memo. 1980-558↩.
10. In Borchert, we listed a number of the other cases supporting the various holdings above but do not deem it necessary to repeat them in this opinion. We also note that previously we have denied petitioners a deduction in 1974 for the cost of acquiring materials from ESP to establish the Trust because we found that it was a nondeductible personal expense under section 262. See Sundheim v. Commissioner,T.C. Memo. 1981-139↩.
11. We will not consider petitioners' untimely contention for the first time on brief that the royalty payments were capital gains under section 1235. Fox Chevrolet, Inc. v. Commissioner,76 T.C. 708, 733↩ - 736 (1981); Rules 31(a) and 141.We observe, nevertheless, that petitioners did not establish at trial that the payments meet the requirements of section 1235.
12. The testimony of the accountant, William A. Mertsching, 1224 Banuck, Denver, Colorado, was stricken when he refused to answer the question of whether he ever referred people to ESP for the purpose of obtaining trust documents. He refused to answer because he is presently in a lawsuit with the Internal Revenue Service with respect to penalties on preparers of income tax returns. See sections 6694 and 6695 as applicable to documents prepared after December 31, 1976.↩