ESTATE OF MADELINE F. McGILL, DECEASED, J.R. HANNA, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of McGill v. Commissioner
Docket No. 21876-81.
United States Tax Court
T.C. Memo 1984-292; 1984 Tax Ct. Memo LEXIS 383; 48 T.C.M. (CCH) 239; T.C.M. (RIA) 84292; June 4, 1984. L. William Schmidt, Jr.,John A. Wallace,Michael C. Russ,L. Joseph Loveland, and Peter J. Genz for the petitioner. Benjamin A deLuna, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined a deficiency of $5,595,018 in the Federal estate tax of petitioner. After concessions by the parties, the sole issue for decision is the date-of-death value of voting trust certificates representing decedent's beneficial interest in stock of a closely-held corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Madeline *384 F. McGill (decedent) died on October 2, 1977. J. R. Hanna was appointed the personal representative of her estate. Hanna timely filed the estate tax return with the Internal Revenue Service in Denver, Colorado.Among the items in decedent's gross estate reported on the return were voting trust certificates representing the beneficial interests in 6,180 shares of Class A common voting stock (50 percent of the outstanding Class A shares) and 144,056 shares of Class C common nonvoting stock (41.54 percent of the outstanding Class C shares) of the Wright & McGill Co. ("WMG"), a Colorado corporation with its principal place of business in Denver, Colorado. Hanna valued the voting trust certificate representing the Class A shares at $74,160 ($12 per share), and he valued the voting trust certificate representing the Class C shares at $1,440,560 ($10 per share). In the notice of deficiency, respondent valued the Class A shares at $5,568,798 ($901.10 per share) and the Class C shares at $3,991,202 ($27.71 per share). Description and History of WMG
The predecessor to WMG was formed in 1925 by decedent's husband, Andrew D. McGill, to manufacture and sell tied flies used for fishing. *385 At the date of decedent's death, WMG was engaged in the manufacture of fishhooks, fishing rods and reels, and other fishing tackle. The fishhooks were manufactured at a plant in Denver and generated approximately two-thirds of WMG's total sales. The rest of WMG's total sales was attributable to sales of fishing rods and other fishing tackle manufactured at a plant in Aurora, Colorado. [1]
WMG produced high-quality fishhooks and sold them under the "Eagle Claw" brand name. They were WMG's most profitable and most successful product line. The fishhooks were manufactured in a multi-step, largely automated process that employed highly sophisticated and complex machinery pioneered by Andrew McGill and built to company specifications. None of this machinery was patented. The production of a saleable fishhook involved an integrated manufacturing process *386 that used not only metal forming machines, but also heat-treating equipment, plating equipment, quality control equipment, bulk loose hook equipment, weedless loose hook equipment, shipping room equipment, finished goods equipment, warehouse equipment, bulk hook storage equipment, hook sorting equipment, and tumbling equipment. Approximately 20 of the metal forming machines were in operation at the date of decedent's death. To run these machines, WMG maintained a staff of highly-skilled operators. It generally took 4 years of training before an operator could become skilled in all aspect of operating a specific machine. Extensive terining was also needed to operate the other machinery used in the production process, such as the heat-treating and plating machines. To keep all of its various machinery operational, WMG maintained a complete machine shop and id all of its repairs in-house. The complexity of the machines was such that considerable down time was experienced despite a regular preventative maintenance schedule.
A third party seeking to purchase the metal forming machines used by WMG would have had to purchase all of the machinery used by WMG, as well as acquire the services *387 of WMG's trained personnel, to produce a finished fishhook and to operate the machines profitably. The machines had no utility apart from their limited and specialized roles in the production of fishhooks. Because of their small size and mundane character, fishhooks were difficult to market by themselves.Rods and reels, on the other hand, were the "glamour" items in the fishing tackle industry and attrached most of the attention at trade shows and on store shelves. In addition, WMG marketed its fishhooks through a number of manufacturer's representatives who were paid on commission and preferred to sell rods and reels because the fishhook business was highly seasonal, whereas road and reels sold well in both the fishing season and the Christmas shopping season. Although foreign competition made WMG's production of fishing tackle considerably less profitable than the production of fishhooks, because of the marketing synergism created by selling fishhooks together with rods and reels, WMG found it necessary to sell the road and reels in order to enhance its sales in the more profitable fishhook line. Business Conditions on Valuation Date
At the date of decedent's death, *388 WMG controlled approximately 70 percent of the entire domestic fishhook market. Its principal competitor was Mustad, a Norweigian manufacturer of quality fishhooks that was repidly moving into the domestic market and undercutting WMG's prices.Other foreign manufacturers were producing low-priced fishhooks that were also attracting WMG's customers, and WMG faced considerable pressure to lower its prices. WMG management viewed the foreign competition as a serious, long-term threat that would eventually cause a substantial erosion of WMG's domestic market share unless it was directly confronted. Thus, in July 1977, WMG reduced the price of its fishhooks.
In addition, foreign manufacturers of fishing rods, with their access of cheap labor, were providing strong competition to domestic manufacturers, including WMG. A substantial portion of WMG's inventory consisted of rods, much of which was obsolete because of the rapid style turnover that is characteristic of the rod industry. As a result, the rod inventory could only be sold at a fraction of its carrying cost.Although rods accounted for only 22 percent of WMG's total sales, rod inventory constituted more than 40 percent to total *389 inventory. The rest of WMG's inventory contained a considerable amount of excess stock, not saleable at regular prices due to WMG's general policy of building inventories, its low inventory turnover, and its failure to maintain inventory controls.
WMG owned insurance policies on decedent's life in the face amount of $1.5 million. The date of death cash surrender value of $260,474.46 was listed as an asset on WMG's financial statement for the fiscal year ended June 30, 1977. A deferred compensation contract between WMG and decedent also became operative upon her death, and WMG was obligated to pay $50,000 per year for 10 years to decedent's estate, adjusted annually for inflation. Other assets owned by WMG at the date of death included life insurance policies on the lives of other key employees with a combined cash value of $126,357 and the real estate supporting the manufacturing facilities in Denver and Aurora. At the time of decedent's death, WMG had a strong liquid position and a healthy current asset to current liability ratio. All of WMG's assets were then in use in the operation of the business, however; none of the noninventory assets were being held for investment *390 purposes. Despite its healthy balance sheet, WMG was experiencing a significant decline in earnings. Although gross sales were increasing slightly, net after-tax income (exclusive of nonrecurring items) had declined from $658,737 in fiscal 1974 to $375,592 in fiscal 1977, a drop of approximately 43 percent. Expressed as a percentage of sales, net income declined from 4.6 percent in fiscal year 1974 to 2.3 percent in fiscal year 1977. During that same period, WMG's return on equity declined from 7.8 percent to 3.4 percent. Its gross profit margin declined from 40.5 percent to 37.2 percent. For the 3-month period ended September 30, 1977, WMG reported a loss of $383,779, exclusive of nonrecurring items, the worst quarterly result in its history. Although this quarter was typically not a strong quarter due to the seasonal nature of WMG's business, the results were at sharp variance with the results of the same quarter in preceding years. For example, the quarter ended September 30, 1974, yielded a net profit of $146,191, and the quarter ended September 30, 1975, yielded a not profit of $37,811. The loss in the quarter ended September 30, 1977, was due, in part, to the aforementioned *391 pricecutting decision made in July 1977.Although WMG's sales increased in general during the years 1972 through 1977, the rate of increase in sales declined approximately from 17 percent in 1973 to approximately 10 percent in 1977. WMG used the LIFO (last-in, first-out) method of inventory accounting for both financial accounting and Federal income tax purposes, which method was adopted during the 1974 fiscal year. Its internal cost of sales figures were kept on a FIFO (first-in, first-out) basis with annual adjustments made to convert the figures to LIFO. In the quarter ending just prior to decedent's death, sales declined 21 percent compared to the sales for the corresponding quarter of fiscal 1976. The decline in sales was matched by a decline in WMG's order backlog at the quarter's end, which was approximately $1 million less than the order backlog at September 30, 1976, and which had deteriorated steadily over the preceding 4-year period. The net worth of WMG shown on its financial statement for the quarter ended September 30, 1977, was $10,506,982, including the cash surrender value of all life insurance policies owned by WMG. Capital Structure and Stock Restrictions
*392 As of October 2, 1977, the capital structure of WMG was as follows: Preferred Stock, par value $100, nonvoting, noncumulative, 4,000 shares authorized, 3,738 shares outstanding. Second Preferred Stock, par value $100, nonvoting, noncumulative, authorized 10,000 shares, no shares outstanding. Class A Common, par value $10, voting, 200,000 shares authorized, 12,360 shares outstanding. Class B Common, par value $10, nonvoting, 60,000 shares authorized, 7,350 shares outstanding. Class C Common, par value $10, nonvoting, 400,000 shares authorized, 346,800 shares outstanding. In 1969, decedent placed her shares in voting trusts established under Colorado law.The trust agreements designated decedent, her son, and Hanna as trustees and provided that the voting rights of the stock could be exercised only by a majority vote of the trustees. Jeremiah Joseph Long was named as successor trustee to decedent under her will. Separate voting trusts were established for the various classes of WMG stock held by decedent and were effective for 10-year periods, due to expire May 5, 1979.With the exception of shares held in trust for Leland C. McGill (24.76 percent of *393 the Class A stock and 24.75 percent of the Class C stock) and the Class B common stock, which was issued as part of a bonus plan for key personnel, the outstanding shares of WMG were all subject to the voting trust agreements. On the date of decedent's death, the beneficial interests of the voting trust participants in the Class A and Class C common were as follows: Shares in
Share Not
Percentage of
Voting
in voting
Shares
Trust
Trust
Outstanding
CLASS A COMMON (VOTING)
Madeline F. McGill
6180
50.00
Leland G. McGill
3060
24.76
Jane Clare Wilkins Trust
20
.16
Josephine Ann LongfieldTrust
20
.16
Georgia Louise Long Trust
20
.16
Leland Carl McGill Trust
3060
24.76
TOTAL
9300
3060
100.00
CLASS C COMMON (NONVOTING)
Madeline C. McGill
144,056
41.54
Leland C. McGill
85,200
24.57
Leland Carl McGill Fund
85,200
24.57
Various grandnieces
and grandnephews and/or
trusts for their benefit
(25 different share-
holders
32,344
* 9.32
TOTAL
261,600
85,200
100.00
In addition to the voting restrictions, decedent's shares were subject to restrictions on tranfers, which restrictions *394 were designed to maintain ownership and control within the McGill Family. The corporate by-laws provided that the outstanding shares of Class A common, Class C common, and preferred stock could not be sold, assigned, or otherwise transferred without offering the shares for sale to WMG at a price equal to book value, as determined by reference to the latest year-end audited balance sheet of the corporation. If WMG declined to purchase the shares, the shareholder was then required to offer them to other shareholders of the same class at the same price as offered to the corporation. As of the date of decedent's death, none of the shares of stock of WMG or the voting trust certificates had ever been sold. In general, the Class A common stock had the sole right to vote for directors and to vote on other matters of corporate business. In certain situations, however, other classes of stock could become voting stock for specific periods or specific purposes. Article III, Section 6, of WMG's by-laws required the approval of the holders of the majorities of the shares of outstanding Class A common stock and preferred stock to effect a sale of assets. In addition, a decision by WMG's *395 directors to sell assets outside of the usual course of business required the approval of the holders of two-thirds of the outstanding shares of Class A common stock. [2] A vote of two-thirds of all of the outstanding shares of stock of the corporation, including nonvoting shares, was required in order to dissolve the corporation. [3]
As of October 2, 1977, WMG had never declared a cash dividend with respect to its Class A or Class C common stock. The Valuations
J. R. Hanna is a former practicing certified public accountant, a business consultant, and a long-time friend of the McGill family. He began his relationship with WMG in 1960 when he was called upon by decedent to help her assume control of the company after her husband died. Hanna took a seat on WMG's board of directors in 1960 and became its chair in 1963, a position he still held at decedent's death in 1977. He acted as a frequent business consultant and financial advisor to WMG and participated in its major policy decisions. After he was appointed personal representative of decedent's estate, Hanna engaged an accounting *396 firm and a law firm to assist him in the administration of the estate. After discussing the various aspects of valuation contained in Rev. Rul. 59-60, 1959-1, C.B. 237 [4] with the accountants and lawyers, Hanna determined values for the decedent's voting trust certificates based on his knowledge of the business and the price/earnings ratios of companies he considered comparable to WMG. He did not employ an appraisal firm to value the certificates prior to filling the estate tax return. *397 Upon learning of the values proposed by respondent after audit of the estate tax return, petitioner hired the investment banking firm of Boettcher & Company to appraise the voting trust certificates held by decedent. Roger H. Bohart, an experienced member of the Boettcher corporate finance department, supervised the valuation project. Bohart calculated the value of shares of WMG's stock by examining the company's earnings for the year previous to decedent's death and the previous 4 years, exclusive of nonrecurring items such as gain from the sale of real estate and proceeds from the insurance policies on decedent's life. He then selected eight publicly-traded corporations that manufacture sporting goods as comparable to WMG and determined their price/earnings ratios, also on the basis of the most recent year's earnings and the average earnings of the previous 4 years. The comparables had revenues for the 1976 fiscal year ranging from approximately $27 million to over $1 billion, compared to $14 million for WMG, and total assets ranging from approximately $20 million to $821 million, compared to $15.5 million for WMG. (Because some of these companies used FIFO accounting, Bohart *398 converted WMG's accounting records in order to make meaningful comparisons). Although WMG was generally less profitable and had a lower return on equity than the other companies, its very strong balance sheet convinced Bohart that WMG's price/earnings multiple based on the most recent year's earnings should be in the middle of the range exhibited by the publicly-traded companies, which was 5.2 to 6.35. He therefore applied a multiple of 5.77 to the earnings per share and arrived at a value of $3,281,731 for WMG. Bohart did not believe, however, that the healthy balance sheet was sufficient to offset 4 years of decline in the percentage increase in sales, so he selected a price/earnings multiple of 4.43, which was near the bottom of the 4-year range of 4.4 to 15.3 exhibited by the comparables, to apply to the 4-year average earnings. This produced a value of $3,091,950 for WMG. The second method used in the Boettcher report to value WMG entailed an examination of WMG's dividend-paying capacity. Seven of the eight comparables paid an average of 34.9 percent of their net income out in dividends, and the dividend yield of each stock based on market prices as of September 30, 1977, averaged *399 5.3 percent. Bohart applied these figures to WMG's adjusted net income after taxes, and found a value of $3,741.971. Mindful of the factors affecting determination of value listed in Rev. Rul. 59-60, Bohart also considered the book value approach, the asset value approach, and the prior sales of stock approach to valuation but concluded that they were not applicable in valuing WMG. He rejected the book value approach, which produced a value of $11,084,945 for WMG, as unrealistic because he believed that a willing buyer would pay only the lower market value as previously determined. He rejected the asset value approach, for which he did not calculate a value, because he believed that a purchaser of decedent's shares could not force a liquidation of the company and personally benefit from the asset value. The prior sale of stock approach was rejected because there had been no prior sales of stock. The three values calculated by Bohart were then averaged, and a final value of $3,371,884 was assigned to WMG. He reduced that amount by $373,800, which represented the value of the preferred shares of stock (3,738 shares outstanding X $100 per share par value), and by *400 $194,187, which represented the value of the Class B shares (the redemption value determined in the most recent audited statement).This give a value of $2,803,897 for the Class A and Class C shares, of which there was a total of 359,160 shares outstanding, and a value per share (with no distinction between classes) of $7.81.Bohart did not assign a greater value to the voting shares because of the voting trust restrictions and his belief that the amount owned by the estate was not enough to dictate control. He concluded that the value of the shares of stock held in voting trust by decedent was $1,173,343.10. Because the value placed on the voting trust certificates by Boettcher was not only substantially less than the value determined by respondent but was also less than the value he had reported on the estate tax return, Hanna hired Standard Research Consultants, which specializes in valuing securities of publicly and privately held corporations, to value the certificates. Morton Makr Lee, senior vice-president and director of operations, supervised the valuation. Lee used the earnings approach and the return-on-equity approach to value the shares underlying the voting trust *401 certificates because of his opinion that the certificates represented a non-controlling interest in a manufacturing concern. For the earnings approach, he first ascertained the nature of the business and its position in the marketplace. Then, he analyzed WMG's financial statements for the proceeding 5 years. Next, he calculated earnings multiples for publicly-traded companies that he considered comparable to WMG, that is, American companies deriving a significant part of their revenues from the manufacture and distribution of fishing equipment or other related equipment with adequate profits over the preceding 5 years. Upon comparison, Lee found WMG had a more severe decline in earning power and profit margins but was more liquid and more conservatively financed, which offset in part WMG's poor performance vis-a-vis the other companies. Thus, although the comparables had median price/earning multiples averaging 8.3, 8.5, and 6.7 for the preceding 5-year, 3-year, and 12-month periods, respectively, Lee decided that a multiple between 4 and 5, applied with the greatest weight on the average earnings per share over the preceding 3-year period, best indicated the value of WMG's stock. *402 From this approach, Lee determined a value per share of $4.25 for both Class A and Class C stock. The comparables examined by Lee had returns on common stock equity of 8.6 percent, 13.9 percent, and 15.6 percent and prices accorded by the stock market that were 57 percent, 64 percent, and 112 percent of book value, respectively. Because WMG's return on common equity for the same period was only 3.4 percent, Lee decided that 40 percent of book value, which was $29.28 per share, was appropriate. This approach provided a value of $11.75 per share for both the Class A common and Class C common shares. Because he was valuing an interest in a going concern, Lee decided that the earnings approach should be given greater weight than the return-on-equity approach. A value of $7 was thus assigned to the shares and then a dicount of 35 percent, determined by reference to the discounts applied by investment companies to restricted stocks held in their portfolios, was applied to that value to arrive at a value of $4.55 for each of the shares represented by the voting trust certificates, for a total value of $683,57o.80. Respondent's valuation report was prepared by Ernest Goldberg, vice-president *403 of Ambrose/Management Advisors, Inc., which specializes in valuation and transfer of closely-held business interests. Goldberg valued the shares of stock underlying the voting trust certicates because he was unaware of the trust restrictions when he prepared his report. Certain valuation assumptions were made by Goldberg in making his determination of value. The primary assumption adopted in the Ambrose report modified the traditional definition of fair market value, as stated in Rev. Rul. 59-60, 1959-1 C.B. 237, [5] which Goldberg amended "to allow [for] a minimal degree of compulsion on the [buying and selling] parties, in the absence of which no transaction could take place" He then redefined fair market value as "the greater of the Net Market Value of Assets or the Fair Market Value derived from the Adjusted Net Cash Flow generated by the subject business" [Emphasis supplied]. Another assumption made by Goldberg was that WMG would continue operating after the hypothetical sale as it had operated before. *404 Goldberg calculated value using two different methods, an adjusted cash flow approach and a net fair market value of assets approach. For the former, he first computed net income (eliminating the LIFO adjustment made by the company) for each fiscal year from 1974 through 1977. He did not remove the proceeds from the sale of real estate, which accounted for approximately $450,000 before taxes in the 1975 fiscal year and $315,000 before taxes in the 1977 fiscal year. Goldberg then figured the average yearly income for the 4 years, which was $794,633, and applied a price earnings multiple of 5. From this method, he determined that WMG was worth $3,973,166. He did not value the actual shares of stock held in trust based on this value for WMG, but abandoned it in favor of the value derived from the approach described below because he believed the cash flow approach yielded a value that was too low. For his second approach, Goldberg ascertained values for all of WMG's assets. For the real estate, he incorporated into his appraisal a real estate valuation prepared by John Vandermiller, an expert real estate appraiser, who determined values of $3 million and $660,000 for the real *405 estate of the Denver facility and the Aurora facility, respectively. To value the assets used in manufacturing fishhooks, Goldberg first computed the adjusted operating profits ostensibly attributable to the wirebending machines for the 1977 fiscal year by ascertaining the gross profit from sales of fishhooks, reducing it by discounts and allowances, and then subtracting the cost of goods as derived from an internal WMG operating statement. From that amount he subtracted operating expenses to arrive at an operating profit of $2,452,239 from the machines. He then reduced this amount by figures representing 15.3 percent and 5 percent of the gross sales to account for material costs and unaccountable variations in business conditions. Goldberg then had a pre-tax profit attributable to the machines of $1,208,199, to which he applied a multiple of five to arrive at a "fair market value" for the machines of $6,040,995. To value other fixed assets of the company, viz., furniture, fixtures, rod-making machines, and fishhook finishing equipment, Goldberg began with the original book cost of the assets.This was increased by 43.5 percent, a figure derived from dividing in half the total *406 increase in the consumer price index over the previous 12 years. He then subtracted the depreciation taken on assets, with a 25 percent adjustment for nonstraight-line depreciation, to produce a value for these assets of $2,005.524. The value placed on WMG's current assets was computed by adding the LIFO reserve back to the company's balance sheet inventory for a total adjusted current asset value of $11,039,931. To this figure was added the life insurance proceeds receivable ($1.5 million); the cash value of life insurance owned by WMG, net of the cash value of the insurance on decedent ($126,357); the value of other assets as derived from WMG's September 30, 1977, interim balance sheet ($1,873,354); the value of the real estate ($3,660,000); and the value of the machines, furniture, and fixtures, as previously determined ($8,046,519), for a total asset value for WMG of $26,246,161. From this total, Goldberg deducted WMG's liabilities, exclusive of deferred compensation obligations of $1.3 million, to arrive at a total asset value of $21,303,842. In his report, he then increased shareholder equity, which was $10,506,982 on the corporate books, by $10,796,860 to make shareholder *407 equity equal to the net asset value of the corporation. To calculate the "fair market" value of the shares underlying the voting trust certificates, Goldberg reduced the book shareholder equity by the value of the outstanding preferred and Class B common shares (determined by reference to the stated redemption values of $107 per share and $24.85 per share, respectively). The balance, $9,924,368, was divided by the total number of shares of Class A common and Class C common stock outstanding, and the resulting figure, $27.63, was assigned as the value per share of the Class C shares. This value per share was then multiplied by the number of Class C shares outstanding to reach the value of $9,582,084 for all Class C shares. This amount was then subtracted from the total book value of the Class A and Class C shares, and the balance, $342,284, was added to the amount previously added as an adjustment to shareholder equity ($10,796,860) to arive at the total value of Class A shares. Thus, the value of all of the Class A shares was determined to be $11,319,144 or $901.23 per share. The value of the shares underlying the voting trust certificates was then calculated and rounded off *408 to $9,550,000. After he had prepared the valuation report for respondent, Goldberg was notified that the assets in the estate were actually voting trust certificates. To account for the voting trust restrictions, Goldberg reduced the value of the shares by applying a 12 percent per annum rate (determined by adding a "minimal risk factor" of 2-3/4 percent to the prime interest rate on September 30, 1977) to discount the previously determined value back from the expiration date of the voting trust to the date of death. This calculation produced a fair market value for the voting trust certificates of $7,800,813. OPINION Fair market value has long been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Section 20.2031-1 (b), Estate Tax Regs.; United States v. Cartwright,411 U.S. 546, 551 (1973). This is a question of fact, with the trier of fact having the duty to weigh all relevant evidence of value and to draw *409 appropriate inferences. Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court.
In determining the value of unlisted stocks, actual arm's-length sales of such stock in reasonable amounts in the normal course of business within a reasonable time before or after the valuation date are the best criteria of market value. Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 276 (1979). WMG's stock has never been publicly traded, however, and there is no evidence of any sales of any class of stock of WMG at any time near the date of decedent's death. In the absence of arm's length sales, the value of closely held stock must be determined indirectly by weighing the corporation's net worth, prospective earning power, dividend-paying capacity, and other relevant factors. Estate of Leyman v. Commissioner,40 T.C. 100, 119 (1963), remanded on other grounds 344 F.2d 763 (6th Cir. (1965); section 20.2031-2(f), Estate Tax Regs. These factors cannot be applied with mathematical precision. *410 Rather, the weight to be given to each factor must be tailored to account for the particular facts of each case. See Messing v. Commissioner,48 T.C. 502, 512 (1967). Both parties relied upon experts' valuations derived from analyses of intrinsic factors. Because of fundamental differences in approach between respondent's expert and petitioner's experts, particularly with respect to the weight to be placed upon net asset value as opposed to earnings or dividend-paying capacity, the amounts arrived at in the valuations were extremely far apart. As we pointed out in Estate of Andrews v. Commissioner,79 T.C. 938, 945 (1982), the degree to which a corporation is actively engaged in producing income, rather than merely holding property for investment, should influence the weight to be given to the values arrived at under the different approaches, but it should not dictate the use of one approach to the exclusion of all others. The regulations call for all relevant factors to be examined and, in a case such as this, values arrived at under each of the *411 accepted valuation methods should be considered. Respondent's expert was incorrect to simply reject an earnings valuation because it produced "too low" a result. Certainly, a prospective buyer would not so reject one particular type of valuation. A buyer of stock in this corporation would necessarily look to the earning capacity for part of his return on his investment. A second major defect in Goldberg's valuation is the inappropriate method used to assign asset values. The metal forming machines, which were adjusted upward by $6 million in Goldberg's calculations, were only a part of an integrated manufacturing process and were not in and of themselves responsible for the income stream as determined by Goldberg. They could only be operated by highly-trained personnel and had very little resale value. Separately valuing them in a manner obviously directed at maximizing the total value to be attributed to the assets, compounded by the additional errors discussed below, so erodes the credibility of Goldberg's opinion as to cause us to accord it little weight as a basis for our determination. See Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441 (1980). *412 Goldberg used FIFO cost of sales figures to calculate the gross profits attributable to the fishhook machines, which resulted in low cost of goods and corresponding high gross profits. Computing earnings on a LIFO basis would more closely approximate the true earnings that the buyer would realize.See Amity Leather Products Co. v. Commissioner 82 T.C.     (May 17, 1984); Fox Chevrolet, Inc. v. Commissioner,76 T.C. 708, 726-727 (1981). In addition, when he capitalized the earnings attributable to the fishhook machines, Goldberg used a pre-tax figure. A potential buyer would be more likely to reduce the income by the taxes payable before capitalizing the earnings. Thus, there would be a lower income stream and a lower value assigned to the machines. Goldberg's valuation of other machinery and furniture and fixtures included some of the machines used to make fishhooks as well as the machinery used to manufacture rods and reels. These machines were ostensibly already valued when the earnings stream was calculated, however. He also valued the rod-making equipment at replacement cost, but most of this machinery was obsolete and could not be sold at any price. *413 As Goldberg himself testified, "The buyer could either acquire the assets and resell them at a profit, or he could acquire the assets and operate them in order to generate an income stream. And essentially that's all he can do." Goldberg assumed that the purchaser would continue to operate the company as it was operated prior to sale. Yet he severed out the income attibutable to the fishhooks without taking account of the fact that it was necessary to produce and sell the unprofitable rods and reels to achieve high sales of fishhooks. Because the relatively high income yield from the fishhook machines was dependent upon the rest of the company's line of products, to be consistent Goldberg should have valued the rest of the manufacturing equipment in the same manner, which would have produced a much lower overall value. The unreasonableness of Goldberg's conclusion as to the value of WMG is apparent when the value of the company determined by Goldberg is compared to its earnings. Even using a 4-year average that includes the proceeds from the sale of real estate, Goldberg's value produces a price/earnings multiple of 27.The most comparable companies were selling at around 5 to *414 7 times earnings, yet WMG's rate of growth in operating income, income before extraordinary items, and earnings per share from 1973 to 1977 was inferior to the performances of these other companies. Although more convincing by comparison, petitioner's experts' valuations are not flawless.They relied heavily on comparisons between WMG and other recreational equipment manufacturers. Each of these comparables, however, was significantly larger than WMG. Petitioner's experts failed to value the underlying assets, which, as we stated in Estate of Andrews v. Commissioner,supra, is an approach that must be given some consideration. It is not unlikely that a potential buyer of WMG could convince the other shareholders to liquidate if the business picture was as bleak as petitioner paints, particularly in view of the loss of key personnel. Finally, both of petitioner's experts value the Class A shares at the same rate as the Class C shares, even though the Class A shares were the voting shares of the corporation. Although a prudent purchaser would consider the voting trust restrictions, these restrictions were due to expire in 19 months. Surely the right to *415 vote inherent in the Class A shares should give these shares an edge in value over the Class C shares. After examining all of the valuation approaches used in this case and considering relevant factors, we are convinced that Hanna's opinion of the values as reported on the estate tax return is the most reliable evidence of the values of the voting trust certificates. Hanna was intimately familiar with all aspects of the business, including the decline in growth of profits, the loss of key personnel, the threat of foreign manufacturers, the strong balance sheet, the voting and marketability restrictions, the specialized equipment, and the value of the underlying assets. Hanna consulted respondent's Rev. Rul. 59-60 and considered the factors enumerated therein when making his determination. His background justifies treating his opinion as that of an expert. See Federal Rules of Evidence, Rule 702. We have no evidence that his opinion of value was understated for the purpose of minimizing estate taxes. Although respondent attempted to show bias by reference to Hanna's personal interests in the company, his personal interests would be adversely affected by understatements *416 of value--particularly if the company were to be sold or liquidated. His fiduciary responsibilities included consideration of income tax consequences of undervaluing the shares, as well as possible conflicts among the beneficiaries of the estate.On the other hand, the estate tax return values should be treated as an admission by the representative, so that lower values cannot be substituted without cogent proof that the reported values were erroneous. We do not find the opinion of petitioner's experts to be persuasive enough in this case to overcome that admission. We, therefore, conclude that the total value of the voting trust certificates in the estate was $1,514,720, comprised of 6,180 shares of Class A stock at $12 per share and 144,056 shares of Class C stock at $10 per share. Decision will be entered under Rule 155.
Footnotes
1. WMG previously had other plants in Greeley and Aurora, Colorado, but business conditions caused WMG to move and consolidate operations and sell the underlying real estate. Four such sales occurred over the 20 years preceding decedent's death; part of the gain from the most recent of these sales was received in 1975 and 1977.↩
*. Approximate↩
2. Colo. Rev. Stat. sec. 7-5-112↩ (2) (1973). 3. Colo. Rev. Stat. sec. 7-8-103↩ (1973).
4. Rev. Rul. 59-60, 1959-1 C.B. 237, 238-239, states, in part: Sec. 4. Factors To Consider. .01 It is advisable to emphasize that in the valuation of the stock of closely held corporations or the stock of corporations where market quotations are either lacking or too scarce to be recognized, all available financial data, as well as all relevant factors affecting the fair market value, should be considered. The following factors, although not all-inclusive are fundamental and require careful analysis in each case: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity of the company. (e) The dividend-paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of the stock and the size of the block of stock to be valued. (h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter. Rev. Rule 59-60 was modified by Rev. Ruls. 65-193, 1965-2 C.B. 370, and 68-609, 1968-2 C.B. 327, and amplified by Rev. Ruls. 77-287, 1977-2 C.B. 319, 80-203, 1980-2 C.B. 101, and 83-120, 1983-2 C.B. 170↩.
5. Fair market value is defined in Section 2.02, Rev. Rul. 59-60, 1959-1 C.B. 237↩ "as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevent facts."